UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DARRYL VAN SCOTT,

     Plaintiff,

v.

     No. 17-cv-12134-DLC

NANCY A. BERRYHILL,
ACTING COMMISSIONER of the
SOCIAL SECURITY ADMINISTRATION

     Defendant.

**MEMORANDUM OF OPINION AND ORDER**

Cabell, U.S.M.J.

## I.   INTRODUCTION

Plaintiff Darryl Van Scott moves for an order reversing the final decision of the Acting Commissioner of Social Security (the Commissioner) denying his application for Title XVI Supplemental Security Insurance ("SSI") benefits. (D. 1). The Commissioner in turn moves for an order affirming its decision. (D. 13). The court has jurisdiction pursuant to 42 U.S.C. § 405(g), and the consent of the parties pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the plaintiff's motion is DENIED and the Commissioner's motion to affirm is GRANTED.

## II.  PROCEDURAL HISTORY

In October 2011, Scott applied for SSI benefits alleging a disability beginning August 11, 2011.  The SSA denied the claim twice, first on January 11, 2012, and then again after reconsideration, on June 10, 2012.

On July 10, 2013, an ALJ held a hearing at Scott's request.  On July 26, 2013, the ALJ found that Scott failed to prove he was disabled as of August 2011.

Scott requested review of the ALJ's decision by the Appeals Council.  On August 9, 2014, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.  Following re-hearings, the ALJ found a second time that the plaintiff was not disabled.

The plaintiff again requested review by the Appeals Council.  On December 28, 2015, the Appeals Council again vacated the ALJ's decision and remanded the matter for further proceedings.

On July 6, 2016, a different ALJ held a hearing and, on August 25, 2016, found that the plaintiff was not entitled to benefits because he had not shown a disability as of October 2011.

The Appeals Council declined the plaintiff's request to review that decision, making it the final decision for purposes of these proceedings.  The plaintiff subsequently filed this action on October 31, 2017.

III. <u>FACTS</u>

Scott was born on December 8, 1963 and was 47 years old at the time he filed his application, making him a "younger individual" under social security regulations. (SSA Administrative Record of the proceedings, pg. 30 (R. __)). 20 C.F.R. § 416.963. He has a limited education and is able to communicate in English. (Id.) He has past relevant work as a security guard and construction laborer. (Id.). With respect to the plaintiff's relevant medical evidence, the parties have submitted an agreed-upon joint statement of facts, which the court adopts and repeats the facts here, with some cosmetic non-substantive edits.

   A.   **Opinion Evidence**

      1.   <u>Plaintiff's treating physician, Dr. Aditya Chandrasekhar, M.D.</u>

The plaintiff's treating provider, Dr. Aditya Chandrasekhar, M.D. offered a medical opinion regarding his ability to do work related activities (physical) in March of 2015. Dr. Chandrasekhar stated that the plaintiff's maximum ability to lift and carry on an occasional basis was fifty pounds. The maximum ability to lift and carry was ten pounds on a frequent basis. He could stand and walk for about two hours during an eight-hour day. There were no limitations regarding the plaintiff's ability to sit during an eight-hour day. He would be able to stand for ten minutes before

needing to change position and he would need to walk for ten minutes.  Walking did not relieve his pain.  He would need the opportunity to shift at will from sitting or standing/walking.  He would sometimes need to lie down at unpredictable intervals during an eight- hour working shift.  This would happen twice during the day.  When asked what medical findings supported the assessed limitations, Dr. Chandrasekhar wrote "neuropathy and use of walking stick."  He would be able to occasionally stoop (bend), crouch, and climb stairs. He could never twist or climb ladders. He was unable to push/pull secondary to hand weakness.  He required an assistive device for ambulation and needed to elevate his leg. He had limitations in kneeling.  The plaintiff would often have symptoms severe enough to interfere with attention and concentration required to perform simple work-related tasks.  He anticipated that the plaintiff would likely be absent from work more than four days a month.

### 2.   State Agency RFC Assessments

Two state agency physicians reviewed the record at the initial and reconsideration phases.  They found in December 2011 and May 2012 that the plaintiff could perform light work.

### B.   **Medical Record**

The plaintiff is HIV positive with onychomycosis.  In 1995 at Boston City Hospital, he was diagnosed as being HIV positive with a CD4 count of 270 cells/mm3 and a CD4 percent of 10 percent.  His

HIV was noted to be stable in April 2011. As a result of his being HIV positive, the plaintiff suffers from "some HIV neuropathy" in his right leg. On March 29, 2011 and April 28, 2011, he reported to Dr. Harigopal that he was suffering from pain and tingling in his right thigh. Dr. Harigopal diagnosed him with neuropathy secondary to HIV with pain in his right leg. The plaintiff was prescribed Neurontin (gabapentin) to alleviate his neuropathic pain and Percocet for breakthrough pain.

The plaintiff additionally suffered from ailments affecting his right shoulder. From March 9, 2011 to March 6, 2013, the plaintiff, who is right hand dominant, repeatedly presented to Dr. Harigopal complaining of joint pain and stiffness, particularly in his right shoulder which had a history of tendonitis. Dr. Harigopal repeatedly observed that the plaintiff had decreased range of motion in his shoulder, with him being unable to raise it above 90 degrees without pain. Dr. Harigopal regularly diagnosed the plaintiff with chronic right shoulder pain and right shoulder tendonitis. On March 3, 2012, Dr. Harigopal stated that, in addition to tendonitis in his right shoulder, the plaintiff also suffers from neuropathy in his right upper extremity. On March 6, 2013, Dr. Harigopal also found that the plaintiff had pain with palpation at the anterior aspect of his right shoulder which was worse with resisted forearm supination. The plaintiff was

prescribed Percocet and naproxen to try to alleviate his right shoulder pain.

In May 2013, Dr. Timothy Cavanaugh noted that the plaintiff had no deformity of either upper extremity, and that he was in fact, quite muscular.  The plaintiff would "not voluntarily abduct [his] left arm at shoulder past about 100 degrees, but [Dr. Cavanaugh was] able to passively raise [his] arm (though [the plaintiff] report[ed] discomfort), and, when [Dr. Cavanaugh] let go of [his] arm, he only slowly lower[ed] [it]."  Dr. Cavanaugh concluded that the plaintiff's shoulder exam was relatively benign. He stated he, "need[ed] to track down report of recent Orth evaluation."  In June 2013, Dr. Cavanaugh stated again that there was no deformity of either shoulder, and that the plaintiff was in fact quite muscular.  He noted that the plaintiff made a "great show" of how much pain he was in but said that he had a nearly full range of motion upon examination.  He noted, "strength is intact but there is some break-away."  Dr. Cavanaugh noted that the plaintiff clearly wanted Percocet and was resistant to the recommendation to go to physical therapy.  The plaintiff stated, "he has done P[hysical] T[herapy] twice before."

On July 3, 2013, the plaintiff presented to Arun Ramappa, MD, complaining of right shoulder pain.  External rotation was decreased, and he had three interspaces of internal rotation on

the right relative to the left.  Dr. Ramappa diagnosed the claimant with right rotator cuff impingement syndrome.

During this time, outside of problems with his shoulder, examinations were often largely normal, and showed normal reflexes, sensation, ambulation, and gait; it was noted that an assistive device was not being used.  The plaintiff was able to manage his daily activities and traveled to Florida in August 2012.

In September 2014, the plaintiff established care with Dr. Aditya Chandrasekhar, M.D.   Dr. Chandrasekhar noted the plaintiff's past treatment with Dr. Harigopal and Dr. Cavanaugh. While the plaintiff did not have any active complaints, Dr. Chandrasekhar continued his HIV diagnosis and continued his gabapentin 300 mg daily.  Dr. Chandrasekhar noted that a review of BIDMC records confirmed that the plaintiff had been doing well and that his HIV was well-controlled.  He had a normal musculoskeletal and neurological exam.  He also had a normal musculoskeletal and neurological exam with Dr. Chandrasekhar in November 2014, with a full range of motion of all joints.  The plaintiff also was able to manage all of his daily activities.

In March 2015, the plaintiff visited Dr. Chandrasekhar and stated he needed paperwork for his disability application.  The treatment note states he was "chiefly limited by leg pain from his neuropathy."  The plaintiff said he had been using a walking stick for six to eight weeks.  His musculoskeletal exam on that date was

7

normal, as was his neurological exam, other than slightly decreased strength of 4/5 in his right leg.  At a psychological exam by another provider in March 2015, the plaintiff's attire and appearance were described, but there was no notation that he used a cane or walking stick.

In August 2015, the plaintiff presented to Dr. Chandrasekhar reporting an accident where he was hit by a car, which was causing sciatica on his right side.  Dr. Chandrasekhar noted at this time that the plaintiff already suffered from peripheral neuropathy and uses gabapentin 300 mg daily.  The plaintiff stated that gabapentin helped some, but also stated that he had gotten some Percocet at the emergency room.  The plaintiff could not perform a straight leg raising test on his right due to pain, but his left leg was normal.  He had a normal attention span and concentration.  His neurological examination was normal, including muscle strength and tone in his legs.  Dr. Chandrasekhar told the plaintiff it could take a few weeks for sciatica to resolve and that Percocet was not indicated.  There was no mention of the plaintiff's use of a cane or walking stick at this visit.  The plaintiff reported that he was able to manage all of his daily activities.  His discharge instructions from the emergency room in August 2015 do not mention the need to use an assistive device.

In September 2015, the plaintiff reported his pain was unresolved and was a 7/10 on the pain scale.  He said his pain was

in his lower back, but now radiated upwards towards his neck. Dr. Chandrasekhar said that his description of the pain was unusual and not typical of neuropathic pain or sciatica. Upon examination, the plaintiff had limited flexion of his back, but his exam was otherwise largely normal. An x-ray of his lumbar spine was unremarkable.

In November 2015, the plaintiff reported improvement and stated the pain is better controlled but stated also that this was not the case every day. Dr. Chandrasekhar's request for an MRI was refused due to a lack of "red flags." The plaintiff said he had gone to the emergency room and was given 9 pills of Percocet because he reported "they told him gabapentin does not work for this pain." Dr. Chandrasekhar noted that the plaintiff looked "much more comfortable than at last visit and was able to easily transfer from chair to exam table with no pain." The plaintiff requested disability paperwork, which Dr. Chandrasekhar passed along to his case manager. Dr. Chandrasekhar told the plaintiff it normally took about two weeks to turn around such paperwork. Upon examination, the plaintiff's back flexion had improved. His examination was largely normal. Dr. Chandrasekhar increased the plaintiff's dosage of gabapentin and recommended physical therapy. He told the plaintiff he did not need opioids.

### C.   __Hearing Testimony__

At the (third) hearing, the ALJ noted that the plaintiff came in with a cane.   The plaintiff testified that he had been prescribed a cane in September 2015.   He testified that "[m]aybe I can make it to the bathroom holding onto the wall and thing, but you know, but I – you know, in the house, I don't always need it, but, you know."

## IV.   __THE ALJ'S FINDINGS__

On August 25, 2016, the ALJ found that the plaintiff was not disabled after following the mandated five-step review process.

Step one considers whether the claimant is engaged in substantial gainful activity ("SGA"), because a claimant who is so engaged is not disabled. 20 C.F.R. § 404.1520(b).  SGA is defined as work activity done for pay that involves performing significant physical or mental activity.  20 C.F.R. §§ 404.1572(a)-(b).  The ALJ found that Scott had not engaged in SGA since his application date.

Step two considers whether the claimant has a medically determinable impairment that is severe, or a combination of impairments that is severe as defined by the pertinent regulations. 20 C.F.R. § 404.1520 (c).  A claimant who does not have an impairment that is severe is not disabled.  Here, the ALJ found that Scott suffered from several severe impairments, including

HIV, anxiety, depression, alcohol abuse, sciatica and anal dysplasia.

Step three considers whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   20 C.F.R. §§ 416.920(d), 416.925, and 416.926.   If so, the claimant is conclusively presumed to be disabled.  If not, one moves to the next step.  The ALJ here found that Scott did not have a combination of impairments that met or medically equaled the severity of one of the listed impairments. The ALJ therefore moved to step four of the process.

Step four considers the claimant's residual functional capacity ("RFC") to work.  This step entails a two-part inquiry. The ALJ first determines the claimant's RFC to work at all, that is, his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.   20 C.F.R. § 416.920(e).  The ALJ then determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. § 416.920(f).  If the claimant has the RFC to do his past relevant work, he is not disabled.  However, if the claimant is not able do any past relevant work, the analysis proceeds to the fifth and last step, which entails asking whether there are any jobs in the national economy the claimant is capable of performing.

11

The ALJ found first that Scott had the RFC to perform light work within the meaning of the pertinent regulations.[1]   In particular, and based on hypotheticals posed to a vocational expert, he found that:

> The claimant could only occasionally operate foot controls with the right lower extremity.  He could only occasionally climb ramps and stairs.  He could never climb ropes, ladders, or scaffolds.  He could occasionally balance, crawl, stoop, kneel or crouch.  He is limited to routine tasks with no detailed instructions.   He could not tolerate more than occasional interaction with the public, supervisors, or co-workers, meaning that successful performance of job duties would involve working primarily with things and not people.  He must be able to take an unscheduled rest room [sic] break once during the workday, in addition to his normal breaks, for five minutes and a rest room [sic] must be available at the place of employment.

The ALJ found at the second part of the inquiry that Scott was unable to perform any past relevant work.

The ALJ therefore moved to step five and found that, given Scott's age, education, work experience and RFC, there were jobs that existed in the national economy that Scott could perform, including jobs as a small product assembler (800,000 positions),

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 416.967(b).

an assembler machine tender (200,000), and shipping checker (70,000).

The ALJ accordingly concluded that the plaintiff was not disabled as of October 6, 2011.  (R. 18-32).

## V.   STANDARD OF REVIEW

This court's review of the Commissioner's decision is limited to an inquiry into whether there is "substantial evidence, on the record as a whole, to support the findings of the Commissioner," *Richardson v. Perales*, 402 U.S. 389, 401 (1971), and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  This may include reasonable inferences drawn from the medical evidence in the reports of treating physicians. *Gray v. Heckler*, 760 F.2d 369, 373 (1st Cir. 1985).  The Commissioner's decision must be upheld if the decision is supported by the substantial evidence in the record as a whole and does not show an error of law.  *Richardson*, 402 U.S. at 390.

## VI.  ANALYSIS

As noted above, the ALJ found at step four that Scott had the RFC to do certain light work.  Scott argues that the RFC was not supported by the evidence in the record because it did not properly acknowledge or account for his reliance on a cane.  If that is

true, the worry is that the ALJ may have then improperly concluded at step five that there were jobs the plaintiff could do with the RFC attributed to him.  The plaintiff argues separately that the ALJ gave too little weight to the opinion of his treating physician Dr. Chandrasekhar.

The Commissioner counters that the ALJ did not err in determining the plaintiff's RFC, because the record failed to demonstrate that the plaintiff needed a cane, and because the ALJ did in any event consider this issue, and properly determined based on the record that the plaintiff did not need one.  The Commissioner argues further that the ALJ properly considered and weighed Dr. Chandrasekhar's opinion.

### A.   Cane Usage

The RFC determination sets out an individual's work-related abilities despite his limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* S.S.R. 96-8p.  Nonetheless,

"[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *See* SSR 96-8p.  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine his RFC.  *See, e.g., Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999).

Relevant to this case, Social Security Ruling 96-9p addresses the use of an assistive device such as a cane in determining RFC:

> **Medically required hand-held assistive device**: To find that a hand-held assistive device is medically required, there must be medical evidence documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).  The adjudicator must always consider the particular facts of a case.  For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded."

SSR 96-9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996).

The ALJ here unquestionably acknowledged Scott's use of a cane -- "The claimant uses a prescribed cane but he is able to still get around such as using the bathroom without it" -- but otherwise did not discuss the cane in assessing the plaintiff's RFC.  (R. 28).  The plaintiff argues that the ALJ's failure to fully consider his use of a cane in determining his limitations

was reversible error because, even assuming the ALJ's statement that the plaintiff could go to the bathroom without a cane was true, the ALJ failed to fully consider the ramifications of the plaintiff's statement that he would need to stabilize himself with a wall in the absence of the cane.  The court discerns no error in the ALJ's assessment of the plaintiff's RFC.

To begin, while it is true that "[a]n individual's RFC may be impacted by a requirement to use a hand-held assistive device," see 20 C.F.R. Part 404, Subpt. P. App. 1, § 1.00(J)(4), an ALJ is not required to include it in a claimant's RFC simply because the plaintiff may have used it at various times.  *See Forester v. Comm'r of Soc. Sec.,* No. 2:16-CV-1156, 2017 WL 4769006, at *4 (S.D. Ohio Oct. 23, 2017).  In this case it is apparent to the court that although the ALJ might have stated things more affirmatively, he did not consider the plaintiff's use of cane in assessing the plaintiff's RFC because he did not believe the plaintiff's use of a cane was medically necessary.

Substantial evidence in the record supports the ALJ's non-consideration of the plaintiff's use of a cane in assessing his RFC.  First, the evidence regarding the plaintiff's use of a cane is remarkably recent.  Although the plaintiff applied for benefits in October 2011, and submitted a record ultimately numbering hundreds of pages, the references regarding his use of a cane

appear for the first and only time in March 2015, almost three and a half years after the plaintiff applied for benefits.

More importantly, the evidence is underwhelming both in terms of its quantity and its force.  There are just three references to the use of a cane, all contained in notes arising from the plaintiff's March 11, 2015 appointment with Dr. Chandrasekhar, and all occurring in the context of the plaintiff's request for paperwork to support his disability application.  In one instance, Dr. Chandrasekhar notes the plaintiff's "neuropathy" and "use of a walking stick" in setting out his opinion on the plaintiff's RFC.  In another, he checks off a box elsewhere on the same form indicating the plaintiff's "need for assistive device for ambulation."  In the third and final instance, Dr. Chandrasekhar notes Scott's own reporting that "[h]e says he has been using a walking stick for at least 6-8 weeks now."  (R. 961, 1078).

Taken together, these references are insufficient in the court's view to constitute "medical evidence documentation *establishing the need* for a hand-held device to aid in walking or standing."  In the first instance, Dr. Chandrasekhar notes the plaintiff's "use of a walking stick" but he provides no elaboration or details to place that phrase in context.  In the second instance, the checking of a box denoting the need for an assistive device arguably has slightly more force but it too fails to persuade where no further explanation placing the reference in

context is provided.  Finally, the third reference regarding the use of a cane for "6-8 weeks" has no force because it facially reflects only the plaintiff's uncorroborated statement.  In short, these references fail to plainly reflect an opinion or finding by Dr. Chandrasekhar that the plaintiff needs a cane or hand-held assistive device.

Even assuming *arguendo* that the references could in the aggregate be seen as reflecting an opinion to that effect, they would still be inadequate to trigger the ALJ's obligation to consider them where they do not meaningfully describe the circumstances for which a cane is needed, that is, where they fail to provide any real insight into the doctor's observations (if any), and whether the plaintiff needed a cane at all times or only at certain times, or for certain situations, distances and terrains.  See SSR 96-9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996).

Moreover, the broader record does not support an inference that the plaintiff needed a cane or hand-held assistive device. As noted, the medical record is devoid of any reference to the plaintiff's use of a cane outside of the references in the March 2015 records.  None of the physicians who treated the plaintiff before he saw Dr. Chandrasekhar in September 2014 reference the use of or need for a cane, and Dr. Chandrasekhar himself noted that the plaintiff had normal musculoskeletal and neurological exams in both September and November 2014, and noted also that he

had a full range of motion of all joints and was able to manage all of his daily activities.

True, the plaintiff testified at the final July 2016 administrative hearing that he had been prescribed a cane in September 2015, but the records fail to corroborate this assertion and a claimant's own testimony that a clinician recommended using a cane does not itself constitute adequate documentation to establish that a cane is medically necessary. *Durfee v. Berryhill*, No. 16-079M, 2017 WL 877272, at *2 (D.R.I. Feb. 15, 2017) (adopted by *Durfee v. Berryhill*, No. 16-79-M, 2017 WL 875825 (D.R.I. Mar. 3, 2017)).

In sum, although there is some evidence in the record regarding the plaintiff's use of a cane, that evidence is insufficient to constitute medical evidence documentation establishing the plaintiff's need for a cane. Even accepting that the ALJ might have in hindsight done better to include such a statement in his findings, the omission was of no legal consequence where, as this court finds, the ALJ's assessment of the plaintiff's RFC was supported by substantial evidence in the record.

**B.   Dr. Chandrasekhar's Medical Opinion Evidence**

The plaintiff argues relatedly that the ALJ accorded too little weight to Dr. Chandrasekhar's opinion that the plaintiff had impairments requiring use of a cane. An ALJ must "always consider the medical opinions in [the] case record." 20 C.F.R. §

416.927(b).  A treating physician's opinion is generally entitled to controlling weight but the ALJ may discount that weight where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians.  *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004).  Where controlling weight is not given to a treating source opinion, the ALJ must consider several factors in determining the weight granted to an opinion, including the length of treatment relationship and frequency of examination, the nature and extent of the treatment relationship, and the consistency of the opinion with the record as a whole.  20 C.F.R. § 416.927(c).  An ALJ is not required to expressly mention each of these factors in the final decision.  *McNelley v. Colvin*, No. 15-1971, 2016 WL 2941714, at *2 (1st Cir. 2016).  Rather, an ALJ need only provide "good reasons" for giving little weight to a treating source's medical opinion.  *See id.* at *1 (quoting 20 C.F.R. § 416.927(c)(2)) (internal quotation marks omitted).

As noted above, the ALJ gave Dr. Chandrasekhar's opinion "little weight" because Dr. Chandrasekhar used a "preprinted form with check marks with little or no explanation or analysis to support the opinion."  The ALJ reasoned that this evidence was "poor" and had "little to no "evidentiary value" in the absence of a "thorough written explanation with references to observations, testing, or citations to the medical records."  (R. 29).  By

contrast, the ALJ accorded greater weight to the non-examining state agency consultants who concluded that the plaintiff retained the RFC to work at a light level in spite of his impairments, because they provided RFC profiles.  Even in doing so, however, the ALJ assessed *greater* physical limitations than the consultants did based on the plaintiff's HIV infection and sciatica, and assessed greater mental limitations than they did based on evidence the ALJ received after the consultants had prepared their assessment.  (Id.).  The ALJ concluded based on the record as a whole that the plaintiff among other things "could only occasionally operate foot controls," "could only occasionally climb ramps and stairs," "could never climb ropes, ladders, or scaffolds," "could occasionally balance, crawl, stoop, kneel or crouch," and was "limited to routine tasks with no detailed instructions."  (R. 26).

Applying the principles noted above, the court cannot say that the ALJ erred in weighing the evidence and assessing the plaintiff's RFC as he did.  In particular, the court discerns no error in the ALJ's decision to discount the medical opinion of Dr. Chandrasekhar in favor of the opinions of the consultants (whose opinions he also discounted in favor of assessing greater physical and mental limitations).  The ALJ clearly considered Dr. Chandrasekhar's opinion but found that it was cursory and bare, and not consistent with other substantial evidence in the record.

In reaching this determination, the ALJ satisfied his obligations under section 416.927(c) to also consider the length, nature and extent of the plaintiff's relationship with Dr. Chandrasekhar, and he moreover provided sound reasons in explaining why he believed the physician's opinion merited less weight than the opinions of others. As noted above and without repeating the foregoing, substantial evidence in the record supported the ALJ's RFC assessment. In this regard, the issue is not whether this court might have concluded differently, but whether the record supports the finding the ALJ reached. *See Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987). As discussed above, it does.

## VII. CONCLUSION

For the foregoing reasons, the plaintiff's motion to reverse or remand the decision of the Commissioner (D. 1) is DENIED, and the Commissioner's motion for an order affirming the final decision (D. 13) is ALLOWED.

*SO ORDERED.*

/s/ Donald L. Cabell_____
DONALD L. CABELL, U.S.M.J.

DATED: March 31, 2019